F. MATTHEW SMITH
Law Office of F. Matthew Smith, LLC
2nd Floor, UIU Building
P.O. Box 501127
San Jose, Saipan, MP 96950
Telephone No.: (670) 234-7455/234-7427
Facsimile No.: (670) 234-7256

F I L E D
Clerk
District Court

MAY 1 0 2006

For The Northern Mariana Islands
By_____
(Deputy Clerk)

Attorney for Plaintiff.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| SAIPAN HANDICRAFT,<br><br>               Plaintiff,<br>vs.<br><br>MICRONESIA WOODCRAFT ENT., INC., et al.,<br><br>               Defendants. | Civil Action No. 05-0040<br><br>**MEMORANDUM IN SUPPORT OF MOTION FOR EXPANDED PRELIMINARY INJUNCTION**<br><br>Date:<br>Time:<br>Judge: Hon. Alex R. Munson |

      Plaintiff Saipan Handicraft ("Handicraft") seeks an expanded preliminary injunction order to stop all Defendants from counterfeiting, and selling counterfeits, of it trademarks and six (6) specific trade dress marks, from infringing upon its rights at common law and under the Federal Trademark Act of 1946, 15 U.S.C. §§ 1051, *et seq.*, from interfering with its business contracts and relations, competing unfairly and engaging in fraud during the pendency of this suit. This motion is based on the files and pleadings, the first amended verified complaint, the attached exhibits and declarations, and the following points and authorities:

1.     For a preliminary injunction, there is a recognized four prong test:

(1) the moving party will suffer irreparable injury if injunctive relief is not granted, (2) the moving party will probably prevail on the merits, (3) in balancing the equities, the non-moving party will not be harmed more than the moving party is helped by the injunction, and (4) granting the injunction is in the public interest.

*Stanley v. University of Southern California,* 13 F.3d 1313, 1319 (9th Cir. 1994).

2.     For more than two decades, Rodrigo Capati ("Capati") and Handicraft has been manufacturing and selling his Bo Jo Bo Wishing Dolls. *See* First Amended Verified Complaint, at ¶ 44 (filed April 18, 2006).



3.  Handicraft obtained ownership and trademark rights in the name "Legend of the Bo Jo Bo Wishing Doll" and "Bo Jo Bo Wishing Doll" after the originators of the name and legend ceased production in or around 1979 and Capati took over the name, legend and manufacturing of such dolls. *See* First Amended Verified Complaint, at ¶¶ 56-58.

4.  Originally, the wishing dolls were large (nearly one foot), used the larger bayogo, and had a look much different from those sold today. *See* Declaration of Augustine T. Camacho, at ¶ 1 (filed January 5, 2006). A sample showing the look and style of the large dolls was taken into this Court's possession following the last preliminary injunction hearing on January 6, 2006.

5.  Since the early 1980s, Capati and Handicraft have continuously manufactured their Bo Jo Bo Wishing Dolls. During the years, Handicraft began using the smaller bayogo, developed and cultivated its specific look, marks and brand, incorporated identifiable and unique features for its dolls, and developed a highly desirable product. *See* First Amended Verified Complaint, at ¶¶ 59-60.

6.  In 2005 (after decades of hard, steady effort by Handicraft), a series of Japanese commercials caused an increase in demand for Handicraft's Bo Jo Bo Wishing Dolls. These commercials prominently featured the Handicraft Bo Jo Bo Wishing Doll, its look, its powers and its owners. This burst of promotion was enhanced and accompanied by the publication in Japan of photos of the Japanese Emperor holding Handicraft's Bo Jo Bo Wishing Dolls, a gift he received during his trip to Saipan. *See* First Amended Verified Complaint, at ¶¶ 76-78.

7.  In a matter of a few short months, Handicraft's Bo Jo Bo Wishing Dolls had become the "must have" item. A just reward for the many years Capati and Handicraft had tirelessly toiled creating and promoting their unique product. Handicraft was inundated with orders for its Bo Jo Bo Wishing Dolls. Everyone wanted the dolls that were shown on TV. Handicraft's efforts were beginning to pay off. *See* Declaration of Rodrigo Capati, at ¶ 2 (dated May 10, 2006), the original of which is attached hereto and incorporated herein as **Exhibit A**.

8.  The demand for the dolls became so great, that other people and companies started

to copy the look, name and marks of Handicraft's Bo Jo Bo Wishing Dolls. The first violator was Defendant Micronesia Woodcraft Ent., Inc., whose owner Tirzo Adriatico, was a former employee of Handicraft. Adriatico, as a former Handicraft employee, knew the market for, and the unique features of, Handicraft's Bo Jo Bo Wishing Dolls and quickly adapted and modified his previously distinguishable and unnamed dolls to look exactly like those sold and created by Handicraft. *See* First Amended Verified Complaint, at ¶ 86; *and see* Exhibits admitted into evidence at initial preliminary injunction hearing on January 6, 2006.

9.  The unique features and distinguishing marks claimed and owned by Handicraft are: (1) the mark and name "Bo Jo Bo Wishing Dolls"; (2) the mark and name "Legend of the Bo Jo Bo Wishing Dolls"; (3) the blue folded identification card; (4) the pistachio nut shell hat; (5) the red seed nose; (6) the painted white straight mouth; (7) the natural colored pony-tail; and (8) the shaped skirts with a similar colored tie. *See* First Amended Verified Complaint, at ¶¶ 65-72.

10. These identifiable and distinguishable features were those promoted on television and associated on television with Handicraft's company name and owners. As a result, the unique features and name of the Handicraft Bo Jo Bo Wishing Dolls are those sought by buyers. *See* **Exhibit A**, at ¶ 3; *and see* **Exhibits D, E, F, G, I & J**.

11. Late last year, when it became apparent that Woodcraft was incorporating Handicraft's unique names, card, hat, hair, nose, mouth and skirt [*see* Exhibit D to initial Verified Complaint (filed December 1, 2005)] into what had previously been Woodcraft's much different looking doll [*see* Exhibit C to initial Verified Complaint], Handicraft tried to take appropriate action.

12. In early November, 2005, Handicraft attempted to notify all infringers of its marks by sending notices to Woodcraft and numerous retailers asking them to respect its trademarks; and, on November 7, 2005, Handicraft also ran a Public Notice in both CNMI papers again trying to alert store owners and the public of its claims and marks. *See* Declaration of Counsel, at ¶¶ 2-3 (dated May 10, 2006), and the newspaper notices attached thereto, the original declaration being attached hereto as **Exhibit B**. When these steps failed to correct the problem, Handicraft filed a complaint

with this Court. *See* Verified Complaint (filed December 1, 2005).

13. This Court was quick to give assistance in the form of a preliminary injunction and restricted Woodcraft from using the total image and look of Handicraft's packaging and card, as well as their configuration and pistachio nut shell hat; but saved for trial the other marks and names claimed by Handicraft. *See* Order Granting in Part and Denying in Part Plaintiffs' Motion for Preliminary Injunction (entered January 17, 2006).

14. In an effort to inform manufacturers and retailers of this Court's injunction and to, again, provide notice of its claims and marks, Handicraft began to systematically distribute notices alerting people of this Court's order, the litigation and Handicraft's unique features, claims and marks: the pistachio nut shell hat, the blue card, the blond pony-tail, the straight white painted mouth, the shaped skirt, and the red nose. *See* **Exhibit B**, at ¶ 4, and the general letter of notice attached thereto.

15. Unfortunately, things just went from bad to worse. Because the demand for Handicraft dolls was what was driving the market, instead of creating different looking dolls Defendants started making and selling counterfeit Handicraft dolls. This allowed retailers to cleverly claim they were selling only original Handicraft dolls when in fact they were selling cheap knock-offs that they had purchased at a fraction of the price and could sell for a much higher profit. *See* Declaration of Joe C. Cabrera, at ¶ 3 (dated May 10, 2006), the original of which is attached hereto as **Exhibit C**.

16. The confusion comes in the form of: counterfeit dolls that try and copy the entire look, name, phone number, address, and even TM mark of Handicraft (*see* **Exhibit D**); counterfeit dolls that skillfully manipulate the Handicraft logo for their own company's gain (*see* **Exhibit E**); counterfeiters who advertise counterfeits on the internet using Handicraft's look, name, numbers and marks (*see* **Exhibit F**); to copies that only steal some of the features and marks (*see* **Exhibit G**). It is important to note that the dolls pictured in **Exhibits D, E, F, G & J** are just a sampling of the many counterfeits and violators that have been purchased or obtained by Handicraft from named

defendants during its investigation. *See* **Exhibit B**, at ¶ 5. And don't forget the poor quality counterfeit doll that was earlier provided to this Court during the first preliminary injunction hearing.

17. These counterfeits have flaws, and that is how they were finally detected as fakes. Handicraft's dolls have a distinct look and quality and only come in certain colors. *See* **Exhibit H**. Now take a look at **Exhibits D, E, F, G & J**. For example, a blue skirt is an easy sign you have a fake because Handicraft does not make blue skirts. Another example is a white tie on a skirt, eyes that are close together, or the placement of "Rota" in the logo instead of "Saipan".

18. A careful look at the blue cards is also helpful as the clarity and quality of the copies often differ. Handicraft has discovered that companies are copying its blue card at copy centers both on and off island. On March 13, 2006, Handicraft caught three men at Pacific Quick Print coping 1,000 fake cards. *See* <u>Declaration of Invictus T. Feliciano</u>, at ¶¶ 3-6 (dated May 10, 2006), as well as a confiscated sample of what was being copied, said declaration being attached hereto as **Exhibit I**. A criminal complaint was filed by Handicraft, but to no avail. *See* **Exhibit I**, at ¶ 4. Unfortunately, the confiscation on March 13, 2006, did not but an end to the problem - as counterfeit dolls were subsequently purchased with cards that perfectly match the look of the copies made at Pacific Quick Print on March 13, 2006. *See* **Exhibit J**.

19. What has been discovered by Handicraft is that many retailers buy a few real dolls from Handicraft that they place in their shop windows; but that they then sell customers fake dolls. *See* **Exhibit C**, at ¶ 3. In addition, Handicraft has discovered that manufacturers will agree in secret to make counterfeit dolls or to remove their tags on their dolls and replace with counterfeit Handicraft tags, all in an effort to circumvent this Court's order and to steal the marks and profits that rightfully belong to Handicraft. *See* **Exhibit C**, at ¶ 4. Defendant Haney (*i.e.*, Great Sunshine Corp.) reported that they sold 20,000 dolls each month. *See* **Exhibit C**, at ¶ 5. Even if it was just for one month, 20,000 dolls at Handicraft's wholesale price of $12 would equal $240,000.00 in lost income!

20.	Further, it has been discovered that small factories manufacturing fake dolls have sprung up around island, but move so frequently each time they are discovered, and are staffed by Chinese and Koreans who claim not to speak or understand English, that it is like chasing ghosts. *See* **Exhibit C**, at ¶ 6. Some of the named defendants are believed to have ties or to be some of these people, but it has been very difficult trying to stop any of them.

21.	As a result of the rampant counterfeiting and theft of its features and marks, Handicraft has been badly crippled. *See* **Exhibit A**, at ¶ 5. The markets in Japan and Saipan have stalled due to uncertainty of origin. Unable to rely on the authenticity of the mark, buyers have slowed or stopped buying. Sales of the Handicraft dolls have almost ceased - as who wants to pay $12 for a doll, when they can buy it on the street for $4 from an undocumented alien. The damage to Handicraft has been substantial. Monthly sales have decreased from a high of around 18,000 sets of dolls to a current low of around 5,000 sets. *See* **Exhibit A**, at ¶¶ 4-6.

22.	These extraordinary efforts to counterfeit the exact name, look and features of the Handicraft doll establish that the claimed marks are unique, distinctive and worthy of protection. The counterfeiters themselves have proven that these marks have value and are universally associated with Handicraft. Defendants have provided their own evidence and justification for expanding the injunction order and protecting the features, name and look of the Handicraft Bo Jo Bo Wishing Doll.

**Irreparable Injury**

23.	According to the courts, Handicraft has suffered irreparable injury:

> [I]f [irreparable harm] includes the impossibility of ascertaining with any accuracy the extent of the loss[,] [t]hat has always been included in the meaning; and I cannot see how the plaintiff will ever be able to prove what sales the defendant's competition will make it lose, to say nothing of the indirect, though at times far-reaching effects upon its good will.

*Foundry Servs., Inc. v. Beneflux Corp.,* 206 F.2d 214, 216 (2d Cir. 1953).

> Damages occasioned by trademark or trade dress infringement are by their very nature irreparable and not susceptible of adequate measurement for remedy at law. The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and

quality of the defendant's goods[, and thus] [i]rreparable harm may result from the loss of goodwill in a given product.

*Storck USA, L.P. v. Farley Candy Co., Inc.*, 797 F. Supp. 1399, 1412 (N.D. Ill. 1992).

24. Showing a "likelihood of confusion" between trademarks suffices to establish both irreparable injury and likelihood of success on the merits. *P. Daussa Corp. v. Sutton Cosmetics (P.R.) Inc.*, 462 F.2d 134, 136 (2d Cir. 1972). In this case, confusion has been taken to a new level considering the number of counterfeiters, retailers selling counterfeits, and companies freely using and profiting - without authorization -- from the sale of dolls with Handicraft features and marks.

25. Handicraft has lost and is losing its goodwill, its profits and its name. This is not fair to a business that has been in existence for decades. No monetary award can adequately compensate for what Handicraft has lost, but a TRO and expanded injunction can at least begin to stop the bleeding.

**Likelihood of Success on the Merits**

26. For an injunction, Handicraft should show that Defendants are using a mark confusing6ly similar to Handicraft's valid, protectable trademark. *See* Order, at 7. There can be no doubt that exact counterfeits are sufficiently confusing. Nor is there any doubt that the counterfeiters have helped establish the distinctiveness of each of the marks and features that are so identifiably Handicraft. The fact that they have modified their dolls to capture the distinct look and features of the Handicraft dolls is the best evidence of all as to the distinctiveness of those features.

27. Using one, some or all of the unique Handicraft marks: the business name, the logo, the address, the phone number, the TM mark, the blue card, the doll name or legend, the red nose, the white straight mouth, the shaped skirt and tie, the blond ponytail hair and pistachio nut shell hat causes confusion; and certifies each features as distinctive and unique. They modify them, because customers want specific features. The Defendants know this better than anyone and have purposely and knowingly modified their dolls to capture and confuse customers. In the process, they have stolen valuable income and goodwill from Handicraft.

**Balancing of Equities**

28. Where, as in this case, there is clear evidence of intent to deliberately steal the trade-dress and trademarks of a plaintiff – especially when the plaintiff has been in the business of producing the product for many years and the defendants only recently developed their product line – the balance of hardships favors the plaintiff. *See Lisa Frank, Inc. v. Impact Int'l, Inc.*, 799 F. Supp. 980 (D. Ariz. 1992) (the product in this case was brightly colored novelty stationery items for young girls).

29. The expanded preliminary injunction that Handicraft seeks would only enjoin Defendants from using Handicraft's identified marks and names. It would not prevent any of them from making and selling dolls with a different name, card, hat, mouth, hair, skirt, or nose. Simple creativity, not thievery, is all that would be required for defendants to continue the sale and production of their own dolls.

30. But as already stated, these are not innocent infringers. These are thieves who have stolen from Handicraft despite numerous warnings, notices and demands. Al the equities are on Handicraft's side.

**Public Interest**

31. Public interests demands the protection of investments and goodwill. For over 20 years, Handicraft has managed, cultivated and protected the look, features and name of its dolls. Now, in the space of several months – it has watched while thieves have worked to dismantle and destroy its rights and name. There is no public interest in allowing others to steal what is not theirs to possess.

32. Further, Defendants' acts are prohibited by federal and CNMI statutes. Federal law gives the Court power to grant an injunction to prevent these acts. *See* 15 U.S.C. § 1116. "[W]hen the acts sought to be enjoined have been declared unlawful or clearly are against the public interest, plaintiff need show neither irreparable injury nor a balance of the hardship in its favor. This is especially true when a statute expressly authorizes interlocutory injunctive relief." 11A Charles

Alan Wright, et al., Federal Practice and Procedure, Federal Rules of Civil Procedure 64 to 65.1 § 2948.4 (2d ed. 1995).

**Conclusion**

33.   The immediate harm is obvious. Each counterfeit damages Handicraft, as does each infringer. The violators and counterfeiters have been contacted, notices have been published in papers, delivered in person and sent by mail – to no avail.

34.   As for expanding the preliminary injunction, the counterfeiters have established the distinctiveness of the marks and features, the damages have been extensive - and further protection is needed if Handicraft is to survive this litigation, much less this Spring.

Respectfully submitted this _____5-10-06_____.

F. MATTHEW SMITH
Attorney for Plaintiff Saipan Handicraft